## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ADRIAN LACEY, | ) | |
|     Petitioner, | ) | |
| | ) | CIVIL ACTION NO. 13-00413-KD |
| v. | ) | |
| | )CRIMINAL ACTION NO. 12-00046-KD-N | |
| UNITED STATES OF AMERICA, | ) | |
|     Respondent. | ) | |

## REPORT AND RECOMMENDATION

Adrian Lacey ("Lacey"), a federal prisoner proceeding *pro se*, has filed a Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (Docs. 69, 71[1]) (the "§ 2255 Motion") challenging his sentence in the above-styled criminal action. The United States of America ("Respondent") has timely filed a response in opposition (Doc. 80) to the § 2255 Motion. Lacey has filed a number of replies (Docs. 81, 82, 87) in support of his § 2255 motion,[2] as well as two motions to compel discovery (Docs. 83, 86), a "Motion Requesting an Urgent Evidentiary Hearing/Motion to Amend Pending 18 USC § 2255" (Doc. 84), and a "Motion to Appeal Criminal Forfeiture under FRCP 32.2" (Doc. 85). The § 2255 Motion is now under submission and is ripe for adjudication. (*See* Doc. 77).

These matters have been referred to the undersigned United States Magistrate Judge for entry of a report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B)-(C), Rule 8(b) of the Rules Governing Section 2255 Proceedings

---

[1] All docket citations herein refer to the docket of the criminal action noted in the style.

[2] Lacey's various requests to supplement his § 2255 motion (Docs. 71, 82, 87) are **GRANTED**.

for the United States District Courts, and SD ALA LR 72.1(c).  Upon consideration, and for the reasons stated herein, it is **RECOMMENDED** that Lacey's § 2255 Motion (Docs. 69, 71), as supplemented (*see* Docs. 81, 82, 87), be **DENIED** and that the claims therein be **DISMISSED with prejudice**.[3]  It is further **RECOMMENDED** that Lacey's two motions to compel discovery (Docs. 83, 86), his "Motion Requesting an Urgent Evidentiary Hearing/Motion to Amend Pending 18 USC § 2255" (Doc. 84), and his "Motion to Appeal Criminal Forfeiture under FRCP 32.2" (Doc. 85) all be **DENIED**.  Finally, it is **RECOMMENDED** that Lacey be found <u>not</u> entitled either to a Certificate of Appealability or to proceed *in forma pauperis* on appeal.

## I.   <u>Background</u>

On March 1, 2012, the Grand Jury of this District returned a two-count indictment against Lacey, both arising from fraudulent activities in connection with the Gulf Coast Claims Facility (GCCF), which was established to administer and process claims arising from the Deepwater Horizon disaster in the Gulf of Mexico in April 2010.  (Doc. 1).  Count One charged use of an unauthorized access device – namely, a GCCF claim – with intent to defraud, in violation of 18 U.S.C. § 1029(a)(2).  (*See id.*).  Count Two charged filing a false GCCF claim in the amount of $50,000, in violation of 18 U.S.C. § 1341.  (*See id.*).

---

[3] The undersigned finds that an evidentiary hearing under 28 U.S.C. § 2255(b) and Rule 8 of the Federal Rules Governing Section 2255 Cases in the United States District Courts is not needed in order to adequately dispose of Lacey's § 2255 motion.  As explained herein, Lacey has not alleged facts that, if true, would entitle him to relief.

Lacey initially retained attorney Ronnie Williams ("Williams") to represent him and entered a plea of not guilty to the charges. (*See* Doc. 9 at 1; Doc. 10 at 1). On  May 3, 2012, Williams filed a Plea Agreement (Doc. 18) and Factual Resume (Doc. 17), both signed by the United States, Lacey, and Williams.  A change-of-plea hearing was held on May 15, 2014, at which Lacey entered a plea of guilty to Count Two of the indictment. (*See* Doc. 20).

Sentencing was initially set for August 17, 2012 (*see id.*), and on August 3, 2012, Lacey, through Williams, filed objections (Doc. 22) to the Presentence Investigation Report.  On August 15, 2012, Lacey filed an unopposed motion to continue sentencing (Doc. 27).  The Court granted the motion and continued sentencing to November 9, 2012.  (Doc. 28).

On October 3, 2012, Williams filed a motion to withdraw as counsel for Lacey, citing a breakdown in the attorney/client relationship and indicating that Lacey had secured other counsel.[4]   (Doc. 29).   On October 5, 2012, attorney Jason Darley ("Darley") entered his appearance as retained counsel for Lacey (Doc. 30), and the Court granted Williams's motion to withdraw on October 9, 2012 (Doc. 31).

On November 5, 2012, Lacey, through Darley, filed a second unopposed motion to continue sentencing (Doc. 32).  The Court granted the motion and initially

---

[4] Lacey claims that another attorney, Daryl Blackmon, "participated in all events (i.e. change of plea, proffer meetings, worksheet meeting, and PSR preparation" and that Williams "only seen [sic] [Lacey] once which was at arraignment[,]" "never participated in no other court proceedings, proffer sessions or never made a jail visit[,]" and "never seen or spoke to [Lacey] regarding this case or plea."   (Doc. 82 at 11). Lacey also alleges that Blackmon was not licensed to practice in this Court at this time.   According to the Presentence Investigation Report, however, Blackmon was Lacey's attorney in a state drug charge.  (Doc. 23 at 16, ¶ 58).

continued sentencing to December 14, 2012  (Doc. 33), then later reset it to December 17, 2012.  On December 17, 2012, pursuant to his guilty plea to Count Two of the indictment, Count One was dismissed, and the Court sentenced Lacey to forty-six (46) months in prison, to be followed by three years of supervised release. (Doc. 35).  The Court's written judgment was entered December 27, 2014.  (*See id.*). On January 14, 2013, on motion of the Government (Doc. 40), the Court amended the judgment *nunc pro tunc* under Federal Rule of Civil Procedure 36 to impose restitution in the amount of $18,000 to the Deepwater Horizon Oil Spill Trust. (Doc. 43).

On December 27, 2012, Lacey filed *pro se* a notice of appeal and motion for appointment of counsel, which were docketed by the Court on January 4, 2013. (Docs. 37, 38).   Darley filed a motion to withdraw on January 13, 2013 (Doc. 42). The Court initially denied Darley's motion to withdraw and Lacey's motion for appointment of counsel (*see* Doc. 46), but, on reconsideration, granted both motions and appointed appellate counsel for Lacey (*see* Doc. 54).

On August 5, 2013, Lacey filed *pro se* the present § 2255 motion (Doc. 69).  As Lacey's direct appeal was pending at the time, the Court ordered Lacey to show cause why his § 2255 motion should not be dismissed without prejudice as premature.  (Doc. 70).   Lacey's appellate counsel provided this Court notice of Lacey's motion to the Eleventh Circuit Court of Appeals to voluntarily dismiss his appeal (Doc. 74), and the Court deferred ruling on Lacey's § 2255 motion pending the Eleventh Circuit's disposition of the appeal (*see* Doc. 75).  On October 7, 2013,

the Eleventh Circuit granted Lacey's motion and dismissed his appeal with prejudice. (Doc. 76). The Court set a briefing schedule on Lacey's § 2255 motion the following day. (Doc. 77).

## II.     Applicable Law

### A.     General Standards Under § 2255

Title 28 U.S.C. § 2255 "permits a federal prisoner to bring a collateral challenge by moving the sentencing court to vacate, set aside, or correct the sentence." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1215-16 (11th Cir. 2014). Section 2255 provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence ... If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255(a)-(b).

"Once the defendant's chance to appeal has been waived or exhausted," a court is "entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims to a federal forum." *United States v. Frady*, 456 U.S. 152, 164 (1982). "[A] collateral

challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal." *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (per curiam) (citing *Frady*, 456 U.S. at 165 (collecting cases)). "Because collateral review is not a substitute for a direct appeal, the general rules have developed that: (1) a defendant must assert all available claims on direct appeal, and (2) relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice. Accordingly, a non-constitutional error that may justify reversal on direct appeal does not generally support a collateral attack on a final judgment unless the error (1) could not have been raised on direct appeal and (2) would, if condoned, result in a complete miscarriage of justice." *Id.* at 1232-33 (internal citations, quotations, and footnote omitted).

> Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding. *McCoy v. United States,* 266 F.3d 1245, 1258 (11th Cir. 2001); *Jones v. United States,* 153 F.3d 1305, 1307 (11th Cir. 1998); *Mills*[ *v. United States*], 36 F.3d [1052,] 1055[ (11th Cir. 1994)]; *Greene v. United States,* 880 F.2d 1299, 1305 (11th Cir. 1989). This rule generally applies to all claims, including constitutional claims. *See Reed v. Farley,* 512 U.S. 339, 354, 114 S. Ct. 2291, 2300, 129 L. Ed. 2d 277 (1994) ("Where the petitioner—whether a state or federal prisoner—failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes cause for the waiver and shows actual prejudice resulting from the alleged violation." (internal quotation marks, punctuation, and citations omitted)); *see also Wainwright v. Sykes,* 433 U.S. 72, 84, 97 S. Ct. 2497, 2505, 53 L. Ed. 2d 594 (1977) (applying cause and prejudice standard to constitutional claims).

A defendant can avoid a procedural bar only by establishing one of the two exceptions to the procedural default rule. Under the first exception, a defendant must show cause for not raising the claim of error on direct appeal *and* actual prejudice from the alleged error. *Bousley v. United States,* 523 U.S. 614, 622, 118 S. Ct. 1604, 1611, 140 L. Ed. 2d 828 (1998); *Mills,* 36 F.3d at 1055; *Cross v. United States,* 893 F.2d 1287, 1289 (11th Cir. 1990); *Greene,* 880 F.2d at 1305; *Martorana v. United States,* 873 F.2d 283, 284 (11th Cir. 1989); *Parks v. United States,* 832 F.2d 1244, 1246 (11th Cir. 1987). Under the second exception, a court may allow a defendant to proceed with a § 2255 motion despite his failure to show cause for procedural default if " 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' " *Mills,* 36 F.3d at 1055 (quoting *Murray v. Carrier,* 477 U.S. 478, 496, 106 S. Ct. 2639, 2649, 91 L. Ed. 2d 397 (1986)); *see also Bousley,* 523 U.S. at 622, 118 S. Ct. at 1611; *Jones,* 153 F.3d at 1307.

*Id.* at 1234-35 (footnote omitted).

Once a petitioner files a § 2255 motion, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." [28 U.S.C.] § 2255(b). A petitioner is entitled to an evidentiary hearing if he "alleges facts that, if true, would entitle him to relief." *Aron*[ *v. United States*], 291 F.3d [708,] 715[ (11th Cir. 2002)] (quoting *Holmes v. United States,* 876 F.2d 1545, 1552 (11th Cir. 1989)). "[A] petitioner need only *allege*—not prove—reasonably specific, non-conclusory facts that, if true, would entitle him to relief." *Id.* at 715 n.6. However, a district court need not hold a hearing if the allegations are "patently frivolous," "based upon unsupported generalizations," or "affirmatively contradicted by the record." *Holmes,* 876 F.2d at 1553 (quoting *United States v. Guerra,* 588 F.2d 519, 520– 21 (5th Cir. 1979)); *see, e.g., Lynn v. United States,* 365 F.3d 1225, 1239 (11th Cir. 2004) ("Because the ... affidavits submitted by Lynn amount to nothing more than mere conclusory allegations, the district court was not required to hold an evidentiary hearing on the issues and correctly denied Lynn's § 2255 motion.").

*Winthrop-Redin*, 767 F.3d at 1216 (footnote omitted).   A court must "liberally construe *pro se* filings, including *pro se* applications for relief pursuant to § 2255."

*Id.* at 1215.

7

## B.      Effect of Guilty Plea

"It is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508 (1984), *disapproved of on other grounds by Puckett v. United States*, 556 U.S. 129 (2009). " 'A guilty plea, since it admits all the elements of a formal criminal charge, waives all non-jurisdictional defects in the proceedings against a defendant.' " *United States v. Brown*, 752 F.3d 1344, 1347 (11th Cir. 2014) (quoting *United States v. Fairchild*, 803 F.2d 1121, 1124 (11th Cir. 1986)). *See also, e.g.*, *United States v. Patti,* 337 F.3d 1317, 1320 (11th Cir. 2003) ("Generally, a voluntary, unconditional guilty plea waives all non-jurisdictional defects in the proceedings."); *Stano v. Dugger*, 921 F.2d 1125, 1150 (11th Cir. 1991) (en banc) ("The Supreme Court has given finality to guilty pleas by precluding claims of constitutional deprivations occurring prior to entry of the plea."). Thus, "only an attack on the voluntary and knowing nature of the plea can be sustained." *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992) (per curiam). Moreover, "even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review." *Bousley v. United States*, 523 U.S. 614, 621 (1998). *Accord United States v. Pearl*, 288 F. App'x 651, 655 (11th Cir. 2008) (per curiam) (unpublished).

## C.      Ineffective Assistance of Counsel

The Sixth Amendment gives criminal defendants the right to effective assistance of counsel. U.S. Const., amend. VI; *Strickland v. Washington*, 466 U.S.

668, 684–86 (1984). "To establish an ineffective assistance of counsel claim, a defendant must show that (1) 'counsel's representation fell below an objective standard of reasonableness' and (2) that such failure prejudiced him in that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *United States v. Pease*, 240 F.3d 938, 941 (11th Cir. 2001) (per curiam) (quoting *Strickland*, 466 U.S. at 687-88, 694). " 'Conclusory allegations of ineffective assistance are insufficient.' " *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) (per curiam) (quoting *United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991)). "Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (citation omitted). *See also Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014) ("A habeas petitioner claiming ineffective assistance of counsel must carry his burden on both *Strickland* prongs, and a court need not address both prongs if the defendant has made an insufficient showing on one.").

> In evaluating the first, or "performance," prong of *Strickland,* "[j]udicial scrutiny of counsel's performance must be highly deferential." [*Strickland*, 466 U.S.] at 689, 104 S. Ct. at 2065. Because retrospective evaluation of a lawyer's performance can be difficult, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that ... the challenged action might be considered sound trial strategy." *Id.* (internal quotations omitted). A petitioner must identify specific acts or omissions that were not the result of reasonable professional judgment, and a court should deem these acts or omissions deficient only if they "were outside the wide range of professionally competent

assistance." *Id.* at 690, 104 S. Ct. at 2066. Simply put, the deference afforded an attorney's decision is great and the bar for proving a Sixth Amendment violation is high. In light of the "strong presumption in favor of competence," we have held that in order to prove deficient performance, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States,* 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Under the second, or "prejudice," prong of Strickland, a petitioner must "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense." 466 U.S. at 693, 104 S. Ct. at 2067. This requires a showing of more than "some conceivable effect on the outcome of the proceeding." *Id.* Instead, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068. Although this standard is difficult to meet, it is significant that a petitioner must show only a reasonable probability that the outcome would have been different; he "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S. Ct. at 2068. When evaluating this probability, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S. Ct. at 2069.

*Brownlee v. Haley*, 306 F.3d 1043, 1059-60 (11th Cir. 2002).

"In *Hill v. Lockhart*, 474 U.S. 52, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985), the Supreme Court held that 'the two part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel,' and that 'to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' " *Pease*, 240 F.3d at 941 (quoting *Hill v. Lockhart*, 474 U.S. at 58-59, 106 S. Ct. at 370-71). *Accord, e.g., Gordon v. United States*, 518 F.3d 1291, 1297 (11th Cir. 2008).

In many guilty plea cases, the "prejudice" inquiry will closely resemble

the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. See, *e.g.,* *Evans v. Meyer,* 742 F.2d 371, 375 (CA7 1984) ("It is inconceivable to us ... that [the defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received"). As we explained in *Strickland v. Washington,* these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker." *Id.,* 466 U.S., at 695, 104 S. Ct., at 2068.

*Hill v. Lockhart*, 474 U.S. at 59-60 (internal citation omitted).

The Supreme Court has recognized that the decision to plead guilty may occur without all of the state's evidence and necessarily takes place without knowledge of all facts revealed by witnesses at trial. *McMann*[ *v. Richardson*], 397 U.S. [759,] 769–70, 90 S. Ct. [1441,] 1448[ (1970)]. "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial." *Wofford v. Wainwright,* 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam); *Downs–Morgan v. United States,* 765 F.2d 1534, 1539 (11th Cir. 1985). An attorney's responsibility is to investigate and to evaluate his client's options in the course of the subject legal proceedings and then to advise the client as to the merits of each. *Tafero*[ *v. Wainwright*], 796 F.2d [1314,] 1320[ (11th Cir. 1986) (per curiam)]; *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir. 1986), *cert. denied,* 481 U.S. 1042, 107 S. Ct. 1986, 95 L. Ed. 2d 825 (1987).

*Stano*, 921 F.2d at 1151.  *See also Brown v. Fla. Atty. Gen.*, 230 F. App'x 896, 899 (11th Cir. 2007) (per curiam) (unpublished) ("To impart such an understanding to the accused, counsel must, after making an independent examination of the facts, circumstances, pleadings and laws involved, offer his informed opinion as to the best course to be followed in protecting the interests of his client."  "The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to attack if the defendant did not correctly assess every relevant factor entering into his decision." (quoting *Wofford*, 748 F.2d at 1508-009 (citations omitted)).

"[F]ailure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255."  *Massaro v. United States*, 538 U.S. 500, 509 (2003).  Indeed, "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance."  *Id.* at 504.  *See also United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir. 2013) ("An ineffective assistance claim should usually be raised in a motion under 28 U.S.C. § 2255." (citing *United States v. Patterson*, 595 F.3d 1324, 1328 (11th Cir. 2010))), *cert. denied*, 134 S. Ct. 962 (2014).

### III.   <u>Analysis</u>

### A.   **Plea Advice**

Lacey claims that, contrary to what was asserted in the Plea Agreement, Williams did not discuss with Lacey possible defenses, did not review the plea agreement or factual resume, and did not meaningfully participate in Lacey's pre-

plea proceedings.  (Doc. 82 at 11).  However, each of these claims is directly contradicted by Lacey's sworn testimony at his guilty plea hearing.  (*See* Doc. 57 [Guilty Plea Hearing Trans.]).[5]  In the Eleventh Circuit, there is "a 'strong presumption' that statements made by the defendant during his plea colloquy are true."  *United States v. Cardenas*, 230 F. App'x 933, 935 (11th Cir. 2007) (citing *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994)).  "[T]herefore, 'when a defendant makes statements under oath at a plea colloquy, he bears a heavy burden to show his statements were false.' " *Id.* (quoting *United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988)).  Lacey has made no attempt to explain how or why his guilty plea testimony should now be deemed false.  Thus, because the record affirmatively contradicts these claims, the undersigned **RECOMMENDS** that they be **DENIED**.

---

[5]

Q [the Court]: Have you had any problem communicating with your attorney?

A [Lacey]: No, ma'am.

Q: Are you fully satisfied with his advice and representation?

A: Yes, ma'am.

Q: He explained the charge to you?

A: Yes, ma'am.

…

Q: Now, you are pleading pursuant to a plea agreement. Did you read that plea agreement and discuss it with your attorney before you signed it?

A: Yes, ma'am.

(Doc. 57 at 2-3).

Lacey also claims that his attorney misrepresented his guideline range and "specified that the government would not use any relevant conduct if he pled guilty." (Doc. 82 at 14). "A guilty plea is open to attack on the ground that counsel did not provide the defendant with reasonably competent advice." *Stano*, 921 F.2d at 1149 (quotation marks omitted). However, any error on the part of counsel in advising him as to the possible guideline sentencing range did not prejudice Lacey. During Lacey's guilty plea colloquy, the Court expressly advised him that he potentially faced a statutory maximum of 20 years in prison. The Court also advised him that the sentencing guidelines are only advisory and the Court was not required to follow them. Lacey indicated that he understood both of these points. (*See* Doc. 57 at 4-5). *See United States v. Bui*, 769 F.3d 831, 835 (3d Cir. 2014) (" '[A]n erroneous sentencing prediction by counsel is not ineffective assistance of counsel where ... an adequate plea hearing was conducted.' " (quoting *United States v. Shedrick,* 493 F.3d 292, 299 (3d Cir. 2007)) (alteration added)); *United States v. Tuyen Quang Pham*, 587 F. App'x 6, 11 (3d Cir. 2014) (unpublished) (" '[W]e have long held that an erroneous sentencing prediction by counsel is not ineffective assistance of counsel where, as here, an adequate plea hearing was conducted.' *United States v. Shedrick,* 493 F.3d 292, 299 (3d Cir. 2007). The written plea agreement stated that Pham faced a mandatory minimum penalty of ten years' imprisonment and a maximum penalty of life imprisonment for each count to which he pled guilty and that no one had made any promises to him to get him to enter a guilty plea. Moreover, the District Court conducted an extensive and thorough plea

colloquy reiterating Pham's sentencing exposure and ensuring that Pham was not pleading guilty because anyone had made any promises outside the agreement. The District Court also explained that it could disregard recommendations by counsel at sentencing, but Pham would still be bound by his guilty plea. Pham told the District Court that he understood all this information. Accordingly, any misperceptions Pham had about his sentence when he decided to plead guilty should have been eliminated by the written plea agreement and the plea colloquy. Thus, the District Court properly denied Pham's claim because he failed to show that, but for his counsel's erroneous prediction about the safety valve provision, he would have pled not guilty and proceeded to trial."); *United States v. Kayode*, -- F.3d --, No. 12-20513, 2014 WL 7334912, at *7 (5th Cir. Dec. 23, 2014) ("[W]hile judicial admonishments are not a substitute for effective assistance of counsel, they are relevant under the second *Strickland* prong in determining whether a defendant was prejudiced by counsel's error."); *United States v. Gutierrez*, -- F. Supp. 3d --,No. CRIM. 06-40043-FDS, 2014 WL 5151112, at *3 (D. Mass. Oct. 8, 2014) ("[E]ven assuming that at some point counsel had erroneously advised petitioner that he faced a maximum sentence of 151 months, by the time he pleaded guilty, he acknowledged that he was aware of the maximum sentence, the applicable sentencing range, and the Court's capacity to depart from the guidelines and impose a variant sentence. He expressed no surprise and raised no questions during the colloquy. And he made no effort to withdraw his plea before sentencing, after counsel allegedly advised him that the Court could sentence him to 210 months.

That is not sufficient, under the circumstances, to demonstrate deficient performance or resulting prejudice.").

Because Lacey has failed to show that he was prejudiced by counsel's alleged error in advising him as to the possible guideline sentencing range, the undersigned **RECOMMENDS** that this claim of ineffective assistance be **DENIED**.

### B.     Failure to File Motion to Suppress

Lacey's § 2255 motion also claims that attorney Williams rendered unconstitutionally ineffective assistance of counsel by failing to move to suppress evidence allegedly seized in violation of the Fourth Amendment during a warrantless search of both his person and his vehicle following a traffic stop. Lacey claims that this was a result of Williams's failure to share and discuss evidence with Lacey. Lacey claims that such a motion would have been successful and he would therefore not have pled guilty and would have insisted on going to trial.

In the Factual Resume that accompanied Lacey's plea agreement, Lacey admitted, *inter alia*, to the following:

> On August 30, 2011, Lacey was arrested by the Mobile Police Department for possession of forged instruments and trafficking in stolen identities. Among the items found in his possession at that time, were claim forms and other documents relating to GCCF claims that were not in Lacey's name. This prompted further investigation into Lacey's claim.
>
> …
>
> On August 30, 2011, agents interviewed Lacey about various GCCF claims at the Mobile Police Department in front of Officer Kevin Naman. After being read and waiving his Miranda rights via SSF 1737B, Lacey gave a statement indicating that he is aware of individuals who are filing false claims with the GCCF. He also

indicated that of the people listed on the sheet of identifications found in his possession at the time of his arrest were people that he assisted in doing taxes and GCCF claims. He further stated that his claim #3100787, was mostly accurate, but that he did make up the payments to his employees, because he always paid them "under the table" and did not have records of those expenditures. Lacey also admitted that he used his claim money to purchase a vehicle from Andrews Imports.

A check of the list of identifications found in Lacey's possession at the time of his arrest indicated that nearly every individual has filed a claim with the GCCF. Audio records obtained also indicate that Adrian Lacey was the one calling to check the status on the various claims. A review of the forms submitted by Lacey to support his claim to the GCCF showed that numerous of the forms were false. The 2009 IRS 1040 form submitted by Lacey indicates that it was prepared by Clarkson CPR and Accounting of 3619 Hillcrest Rd. Mobile, AL, 36695. A check with the Secretary of State's website indicates that no such business exists. The address listed for the business does not exist and the phone number provided rings to Providence Hospital. The 1040 for also [sic] purported to be prepared on October 7, 2010, which is two days after the claim was filed with the GCCF.

(Doc. 17 at 2-4).

Lacey has attached as an exhibit to his § 2255 motion an "Investigative Narrative" prepared by a "Corporal Thomas Whittington" of the "Mobile Police Financial Crimes Detail" on August 31, 2011, that provides a statement of the events leading to Lacey's August 30, 2011 arrest. (Doc. 69 at 10-11). Lacey claims that the Investigative Narrative was included in the discovery materials provided to him by Darley following his sentencing. (*See* Doc. 71 at 2). Corporal Whittington's Investigative Narrative states, in part, as follows:

On August 30, 2011 at 1530 hours, I was contacted by Officer K. Naman…He had a driver, black male, Adrian Lemoyne Lacey…detained for investigative purposes reference finding a fake Alabama ID on the subject's person during a traffic stop at St. Charles Ave. at St. Stephens Rd. in front of 359 St. Charles Ave. The driver was stopped for No seatbelt at the location. Upon approach the driver

17

produced a Florida driver's license.  The driver was found to have a suspended Alabama license.  Upon removing the subject, the driver was terry patted for officer safety.  Officer Naman felt what appeared to be a plastic ID or card in the driver's right pocket.  The driver then told him it was another person's ID and the driver took the ID out of his own pocket.  The ID was for a white male, [redacted] Johnson [redacted] with a DL number of [redacted].  There was also a social security card with the ID that had the number [redacted].  Officer Naman immediately could tell the ID and social security card were fake.  The driver then produced a document that read Indemnity Bond with check Payee as Roderick Johnson.  The document was for the purpose of reporting a lost/stolen BP Oil Spill check.  Officer Naman detained Adrian Lacey in the rear of his Police vehicle and then called me.  Officer Naman then ran the ID and social security number.  The ID number came back to white female, Mary Ann Matson of Madison, Alabama.  The social security number came back to a heavy set black male Roderick C. Johnson of Mobile, Alabama.  Officer Naman issued two citations to the subject for Seatbelt Violation and Suspended Driver's License.

(Doc. 69 at 10).

Per the Investigative Narrative, Lacey's vehicle was subsequently "inventoried for impound and towing," with a search turning up a manila file folder containing several documents, the first being a "two page list fifty-two [sic] names, date of birth's [sic] and social security numbers[,] and the rest being "tax forms for some of the listed subjects and BP check confirmation forms."  (*Id.*).  Lacey was then arrested "for Possession of a Forged Instrument 2nd Degree reference the fake Alabama license and BP document" and was transported to Corporal Whittington's office.  (*Id.* at 10-11).  After receiving warnings in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966), and signing a "rights waiver form," Lacey purportedly

said that the list of fifty-two names partially came from the client list of his Mother, who owns Lacey Tax Service in Prichard, Alabama.  He advised that a few of the names were of legitimate clients that he has done tax work for.  The other names are for BP claims which he has

> made and profited from.  He advised some of the listed person's [sic] had no knowledge of his actions.  Adrian Lacey also advised that he paid over $50,000.00 in cash for the Mercedes and that the money came from BP checks.  Adrian Lacey was further charged at this time with Trafficking in Stolen Identities.

(Doc. 69 at 11).  Corporal Whittington then "contacted Special Agent Joseph Lea of the United States Secret Service[,]" who further interviewed Lacey.  (*Id.*).

Per the Factual Resume that accompanied Lacey's guilty plea, "among the items found in [Lacey's] possession" on August 30, 2011, "were claim forms and other documents relating to GCCF claims that were not in Lacey's name."  (Doc. 17 at 2).  These documents "prompted further investigation into Lacey's claim."  (*Id.*).  "A check of the list of identifications found in Lacey's possession at the time of his arrest indicated that nearly every individual has filed a claim with the GCCF."  (*Id.* at 4).

Lacey now claims that Corporal Whittington's Investigative Narrative contains several false representations:

- Rather than being "immediately" able to tell the ID and social security card Lacey produced from his pocket were fake, it took the officers "nearly forty five minutes to an hour after removing the ID from [Lacey]'s pocket and person to determine it was fake[,]" during which time Lacey was asked to "have a seat in the back of his car, free of handcuffs, while they searched [Lacey]'s car without consent or ever reading [Lacey] his Miranda Rights."  (Doc. 69 at 3, 5.  *See also id.* at 5 ("The narrator account of the officer immediately noticing the ID was fake is false.")).

19

- The Investigative Narrative "says that [Lacey] not only removed the ID on his own free will but also took out a social security card along with it." (*Id.* at 3). Without expressly denying the Narrative as to this point, Lacey states he "would like a suppression hearing so the court can review the tape and determine whether the officer removed the ID or [Lacey] removed it due to coercion and duress." (Doc. 69 at 4. *See also id.* at 5 ("[T]he narrator wants this court to believe that after the terry pat petitioner just plain out volunteered that he was in possession of someone's ID and Social Security Card and pulled it out on his own free will, absent coercion or involuntary questioning, which then turned to a criminal investigation basically on the heels of petitioner's own free will. This evidence is subject to a suppression hearing."); Doc. 71 at 5 (claiming August 30, 2011 traffic stop "lacked probable cause for police to reach into petitioner's pocket and remove a ID [sic] card after police already had petitioner's Florida license in their possession before they asked him to exit his car")).

- The Investigative Narrative's statement that Lacey "produced a document that read Indemnity Bond…is also false[,]" and "[t]he footage will show this never happened." (Doc. 69 at 6).

Lacey alleges that Williams "never attended a court proceeding or interview with petitioner[,]…sent another attorney…whom [sic] did not have license to practice federal law in Alabama[, and] failed to provide [Lacey] with a motion of discovery therefore depriving [Lacey] of an opportunity of suppressing evidence

obtained from an illegal Terry Pat search as well as the arresting officers statement and report." (Doc. 69 at 1). Williams purportedly was "deficient for not advising [Lacey] about the legal ramifications inserted in the fourth amendment rights of being free of illegal search and seizure" and, "[a]bsent of a weapons search or patdown, [Williams] never told [Lacey] that police were not allowed to reach into your pockets or make you empty your pockets." (*Id.* at 2). Lacey claims that, if not for Williams's errors, Lacey "would have suppressed the evidence obtained from illegal Terry Pat search of his person and vehicle used to build a federal prosecution and conviction against him." (*Id.*). Williams purportedly "misled [Lacey] by telling him they could search car due to a driver having a suspended license." (*Id.*).

Lacey claims that all evidence seized from his person and car on August 30, 2011, is due to be suppressed as having been seized in violation of the Fourth Amendment. He claims that he did not raise these concerns to Williams earlier because he "was only shown the first three pages of his discovery" and was not shown the Investigative Narrative, thus denying him "a chance to challenge the police story and denied a chance to argue." (Doc. 71 at 2). Williams "instead persuaded [Lacey] that the case was pretty much won by the prosecution due to the evidence found in his car and the incriminating interrogation…at the county jail on September 14, 2011." (*Id.*).

Lacey claims Williams "failed to file motion to suppress and was ineffective in depriving [him] with at least the opportunity or right to file one." (Doc. 69 at 7). However, Lacey cannot obtain relief under § 2255 by simply claiming that counsel's

failure to file a motion denied him "the opportunity or right" to argue suppression, as "the failure to file a suppression motion does not constitute *per se* ineffective assistance of counsel…" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). *See also Curbelo*, 726 F.3d at 1267 ("[C]ounsel is not ineffective for failing to file a meritless suppression motion." (citing *Jefferson v. Fountain*, 382 F.3d 1286, 1297 (11th Cir. 2004))). "A failure to file a motion to suppress that is based on a lack of knowledge of the state of the evidence due to counsel's misunderstanding or ignorance of the law or failure to conduct adequate investigations can satisfy *Strickland*'s deficiency prong." *Green v. Nelson*, 595 F.3d 1245, 1249 (11th Cir. 2010) (citing *Kimmelman*, 477 U.S. at 383-87). "To obtain relief where an ineffective assistance claim is based on trial counsel's failure to file a timely motion to suppress, a petitioner must prove (1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006) (per curiam) (citing *Kimmelman*, 477 U.S. at 375). *See also Green*, 595 F.3d at 1251-52 ("To establish prejudice in the context of ineffective assistance of counsel for failure to raise a Fourth Amendment claim, a defendant must show that (1) the underlying Fourth Amendment issue has merit and (2) there is a 'reasonable probability that the verdict would have been different absent the excludable evidence….' " (quoting *Kimmelman*, 477 at 375)).

> The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all

the circumstances. In making the competency determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies,…counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. But…a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Kimmelman*, 477 U.S. at 384   (citing *Stickland*, 466 U.S. at 689-91) (internal citations and quotations omitted).

First, the undersigned agrees with the Government that Lacey, while providing a plethora of legal authority setting forth general Fourth Amendment considerations, "provides little to no factual support for his argument that the evidence was obtained illegally."  (Doc. 80 at 12).  In bringing this claim, Lacey bears the initial burden of alleging reasonably specific, non-conclusory facts that, if true, would entitle him to relief.  *Winthrop-Redin*, 767 F.3d at 1216.  However, Lacey's sparse factual allegations largely consist of him haphazardly pointing out various portions of Corporal Whittington's Investigative Narrative and simply claiming "that's not what happened," without putting forth a specific and consistent narrative to counter Corporal Whittington's.  For instance, at times Lacey appears to claim that Officer Naman removed the ID and social security card from Lacey's pocket during the August 30, 2011 traffic stop, while at other times Lacey suggests he might have removed them himself due to "coercion and duress."  Even construed liberally, Lacey's allegations as to this claim fall short of the level of specificity

required to show entitlement to an evidentiary hearing, much less any relief, on the issue.

Moreover, Lacey's own allegations indicate that Williams's failure to file a motion to suppress was not "based on a lack of knowledge of the state of the evidence due to counsel's misunderstanding or ignorance of the law or failure to conduct adequate investigations…" *Green*, 595 F.3d at 1249. Rather, Lacey admits that Williams "persuaded [him] that the case was pretty much won by the prosecution due to the evidence found in his car and the incriminating interrogation Jeff Dean [sic] allowed [Lacey] to participate in at the county jail on September 14, 2011." (Doc. 71 at 2). As the Government correctly points out (*see* Doc. 80 at 13), Lacey has not challenged the veracity of the facts regarding his September 14, 2011 interview with law enforcement officials, conducted after a separate arrest on September 9, 2011, for possession of narcotics. (*See* Doc. 17 at 2). The Factual Resume accompanying Lacey's Plea Agreement sets forth the following facts regarding the interview:

> On September 13, 2011, Lacey contacted USSS Special Agent Joe Lea from the Mobile Metro Jail. He asked SA Lea to come speak with him about the cases against him. Knowing of a previous court hearing, SA Lea inquired if he currently had an attorney. Lacey stated that Jeff Dean was his attorney and that he wanted to speak to me outside his presence. Agents informed him that they must contact Mr. Dean prior to any contact. That same day at 3:18pm, agents contacted Jeff Dean via speaker phone with Cpl. Thomas Wiftington [sic] present about meeting with his client. He stated that agents could meet with Lacey outside of his presence at any time.

> On September 14, 2011, Cpl. Thomas Wittington and agents met with Lacey at the Mobile Metro Jail. After being read and waiving his *Miranda* Rights via SSF 1737B, agents interviewed Lacey about my

latest findings. He admitted at that time that he has created false documents for others in an attempt aid them in getting money from the GCCF. He also admitted that he submitted a false IRS 1040 form to the GCCF in support of his claim. He also admitted that his would be for a seafood company that went out of business prior to the oil spill. Lacey advised that he was in prison at the time of the oil spill claim and could not operate the business.  Agents questioned Lacey about the numerous tax return payments that appear in his bank accounts. He stated that he has filed tax returns for several hundred individuals and to ensure payment, the returns would be deposited into his account and he would pay the client, less his payment, from his own account. Lacey volunteered the information about the $112,000 that agents had previously observed. He stated that he did not know why the deposit had been made into his account, though it appeared to be a tax return, he knew it was not supposed to be there and some error must have been made. He admitted that he took the money out immediately and spent it, knowing that it was not rightfully his. Lacey also stated that the money that was in his possession at the time of his arrest on September 9, 2010 was directly from the sale of his vehicle that he purchased with the Fraudulent BP money.

(*Id.* at 4-5). Rather than challenge the veracity of these facts, Lacey simply asserts that this confession would also have been suppressed as "fruit of the poisonous tree."

The Eleventh Circuit has explained:

Evidence, including verbal statements, obtained as a result of an unlawful search are subject to exclusion. *See Wong Sun v. United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963). Although its purpose is to prevent lawless conduct by law enforcement officials, the exclusionary rule is not to be "interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *Brown v. Illinois*, 422 U.S. 590, 600, 95 S. Ct. 2254, 2260, 45 L. Ed. 2d 416 (1975) (quotation marks and citation omitted). An inquiry as to the applicability of the exclusionary rule must address whether the evidence or "fruit of the poisonous tree" was obtained by the "exploitation of that illegality or instead by means sufficiently distinguishable [from the illegal action] as to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488, 83 S. Ct. at 417 (internal quotations and citation omitted)…

...

> The question of whether a defendant's statement, given after an illegal arrest and *Miranda* warnings, "is the product of a free will ... must be answered on the facts of each case. No single fact is dispositive." *Brown,* 422 U.S. at 603, 95 S. Ct. at 2261. The relevant factors in making the threshold determination of voluntariness include the *Miranda* warnings, "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S. Ct. at 2261–62 (internal citation and footnote omitted). The prosecution bears the burden of showing admissibility. *Id.* at 604, 95 S. Ct. at 2262.

*Parker v. Allen*, 565 F.3d 1258, 1290-92 (11th Cir. 2009).

The Eleventh Circuit has found a defendant's confession to be sufficiently attenuated from an illegal arrest where the confession "began approximately forty-five minutes after his arrest, away from the scene of the arrest, made after twice being advised of his *Miranda* rights..." *United States v. Edmondson*, 791 F.2d 1512, 1515-16 (11th Cir. 1986) (citing *Brown*, 422 U.S. at 603–04 (*Miranda* warnings, though not determinative alone and *per se,* are an important factor in determining whether a confession is obtained by exploitation of an illegal arrest)).

The Eleventh Circuit has also rejected a defendant's "fruit of the poisonous tree" argument where the statements the defendant sought to be suppressed "were not made until the day after the arrest[,]" his "arrest on June 18 and his questioning on June 19 were conducted by different individuals[, the] questioning pertained to a specific and circumscribed issue ([the defendant]'s immigration status) completely distinct from the subject of his arrest (suspected drug activity)[,]" and "[n]othing in the record suggest[ed] that the stop of [the defendant]'s vehicle

and then his arrest, were motivated by an ulterior purpose" or "indicate[d] any flagrant behavior by…anyone…involved in [the defendant]'s arrest and interrogation." *United States v. Lopez-Garcia*, 565 F.3d 1306, 1315-16 (11th Cir. 2009).

Even more significant than the one-day lapse of time in *Lopez-Garcia* and the forty-five minute lapse in *Edmondson*, Lacey's September 14, 2011 confession occurred fifteen days following the purportedly illegal August 30, 2011 search and seizure, with an intervening arrest on unrelated drug charges occurring in between. Like the defendant in *Edmondson*, Lacey was given *Miranda* warnings prior to being questioned on both dates.   As in *Lopez-Garcia*, Lacey's questioning on September 14, 2011, was conducted by different law enforcement officials (federal agents) than those who participated in the August 30, 2011 traffic stop and vehicle search (City of Mobile police officers).   Moreover, it was Lacey who initiated contact with federal agents to set up the September 14, 2011 interview, with Lacey expressly indicating that he wanted to speak with the agents outside the presence of counsel (though the agents still notified counsel at the time beforehand and obtained his consent to conduct the interview).

Given these circumstances, uncontroverted by Lacey, it was reasonable for Williams to conclude that, even if evidence from the August 30, 2011 traffic stop and arrest could have successfully been suppressed, Lacey's admissions at his September 14, 2011 interview would likely be deemed too attenuated to also be suppressed as "fruit of the poisonous tree."   That Williams ultimately considered

suppression of the September 14, 2011 interview to be untenable is supported by Lacey's allegation that Williams "criticized a former counsel of [Lacey], Jeff Dean [sic], for allowing agents to interview [him] at the jail without being present"  (Doc. 81 at 9) and said the interview "was much too incriminating to go to trial with" and "sunk the case."[6]  (Doc. 82 at 5, 7).

Whether Williams's assessment would have ultimately proved to have been correct is irrelevant.  As the Supreme Court has explained, "a counseled defendant may not make a collateral attack on a guilty plea on the allegation that he misjudged the admissibility of his confession. 'Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be

---

[6]    Lacey asserts that "Counsel Jeff Dean [sic] was ineffective for allowing petitioner to talk to agents without a proffer"  (Doc. 82 at 6) and that the interview is therefore due to be suppressed "based on Sixth Amendment violations."  (Doc. 81 at 5.  *See also* Doc. 82 at 8 ("…Petitioner's Sixth Amendment rights were violated by Jeff Dean first and then by agents.")).  However, "[t]he Sixth Amendment right[ to counsel in all criminal prosecutions] is offense specific" and "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  *Philmore v. McNeil*, 575 F.3d 1251, 1257 (11th Cir. 2009) (per curiam) (quotations omitted).  Here, at the time of Lacey's interview, his federal criminal prosecution had not yet commenced, and Deen has never served as counsel for Lacey in this action.  Accordingly, even assuming Deen performed deficiently in allowing the interview to occur, Lacey's Sixth Amendment right to counsel in the criminal prosecution he now challenges had not attached at the time.  *See id.* at 1258-59 ("Absent a Sixth Amendment right to counsel, there can be no violation of the Sixth Amendment right to the effective assistance of counsel.").  *Cf. United States v. Burgest*, 519 F.3d 1307, 1310-11 (11th Cir. 2008) ("…Burgest's state drug charge was a different offense than his federal drug charges for Sixth Amendment purposes. Burgest's prior invocation of his right to counsel for the state drug charge did not attach to the uncharged federal drug offenses at the time of the interview.").

     Additionally, Lacey has not disputed that he contacted federal agents himself and expressly requested to speak with them outside of Deen's presence.  "When a defendant preempts his attorney's defense strategy, he thereafter cannot claim ineffective assistance of counsel."  *Stano v. Dugger*, 921 F.2d 1125, 1151 (11th Cir. 1991) (en banc).

on given facts.' " *United States v. Broce*, 488 U.S. 563, 572 (1989) (quoting *McMann v. Richardson*, 397 U.S. 759, 770 (1970)).[7]

Lacey admitted during the September 14, 2011 interview that he had filed a false claim with the GCCF on behalf of a defunct business, and both counts of the indictment charged crimes related to this particular false claim. Because Lacey's allegations do not establish that Williams's failure to file a motion to suppress was "based on a lack of knowledge of the state of the evidence due to counsel's misunderstanding or ignorance of the law or failure to conduct adequate investigations[,]" Lacey has not alleged facts satisfying *Strickland*'s "deficient performance" prong regarding Williams's failure to file a motion to suppress. *Green*, 595 F.3d at 1249.

Because Lacey has not alleged facts that, if true, would entitle him to relief on this claim, *see Winthrop-Redin*, 767 F.3d at 1216, he is not due an evidentiary hearing on it, and the undersigned **RECOMMENDS** that Lacey's § 2255 motion be **DENIED** as to his claim of ineffective assistance of counsel for failure to file a motion to suppress.

---

[7] Counsel's performance is not deficient simply because a foregone challenge might have been, but was not certain to be, successful. *Cf. Smith v. United States*, 559 F. App'x 933, 935-36 (11th Cir. 2014) (per curiam) (unpublished) ("[W]e conclude that Smith cannot prevail on his ineffective assistance of counsel claim. Specifically, Smith's claim fails because he cannot show based on the facts of this case and his counsel's perspective at the time, that his sentencing counsel's performance was deficient, or outside the wide range of professionally competent assistance. A challenge to Smith's child abuse conviction as an ACCA predicate was not certain to be successful given this circuit's law at the time. *See United States v. Glasco*, 223 F. App'x 951, 956 (11th Cir. 2007) (finding child abuse conviction constituted a 'crime of violence' for purposes of a sentencing enhancement)."), *cert. denied*, 135 S. Ct. 175 (2014).

## C.   Ineffective Assistance at Sentencing

Lacey next claims that sentencing attorney Darley was ineffective for failing to pursue objections to two guidelines sentencing enhancements.[8]   As the Government correctly notes, attorney Williams filed objections to both sentencing enhancements prior to withdrawing as Lacey's counsel (*see* Doc. 22), but attorney Darley expressly withdrew those objections at the sentencing hearing.[9]   (*See* Doc. 64 at 13-14).  He also claims that Darley was ineffective because he allowed Lacey's sentence to be enhanced based on information provided by Lacey as part of his plea agreement.

The undersigned first addresses the Government's argument that, even if Lacey could have successfully maintained these objections to the sentencing guidelines calculation, he cannot show prejudice by Darley's failure to do so because "the Court agreed that it would have imposed the same sentence regardless of the guideline calculations."  (Doc. 80 at 15 (citing *United States v. Keene*, 470 F.3d 1347, 1348–50 (11th Cir. 2006)).  *Keene* stands for the proposition that, "[w]here a district judge **clearly** states that he would impose the same sentence[ under the factors outlined in 18 U.S.C. § 3553], even if he erred in calculating the guidelines, then any error in the calculation is harmless."  *United States v. Barner*, 572 F.3d 1239,

---

[8] "Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because 'any amount of [additional] jail time has Sixth Amendment significance.' " *Lafler v. Cooper*, 132 S. Ct. 1376, 1386 (2012) (quoting *Glover v. United States*, 531 U.S. 198, 203 (2001)).

[9] While Darley filed a Sentencing Memorandum (Doc. 34) before the sentencing hearing, it addressed only the sentencing factors of 18 U.S.C. § 3553(a) and did not make additional objections to guideline calculations.

1248 (11th Cir. 2009) (citing *Keene*, 470 F.3d at 1349) (emphasis added).  *See also Deonarinesingh v. United States*, 542 F. App'x 857, 862 (11th Cir. 2013) (per curiam) (unpublished) ("The guideline error is harmless if the district court **unambiguously** expressed that it would have imposed the same sentence, even without the erroneous calculation." (citing *Barner*, 572 F.3d at 1248) (emphasis added)).   "[T]he burden of proving that an erroneous Sentencing Guidelines calculation is harmless is on the government." *Deonarinesingh*, 542 F. App'x at 862 n.3 (citing *United States v. Paley*, 442 F.3d 1273, 1278 (11th Cir. 2006) (per curiam)).

In announcing Lacey's sentence, the Court specifically found "that the guidelines in this case are appropriate[,]" "found the advisory guideline range is appropriate for the facts and circumstances of this case and provides a reasonable sentence[,]" and stated that it was "going to sentence [Lacey] to the low end of the guideline based on…[his] attempt to cooperate because, otherwise, I would follow the recommendation that I should go higher than that."  (Sentencing Hearing Trans., Doc. 64 at 26-27).  Following the Court's announcement of the sentence, the Government, concerned "if the 11th Circuit were to review," asked the Court "to make a statement whether this would be an appropriate sentence, regardless of the guideline calculations."  (*Id.* at 28).  The Court responded:

> Yes. I believe the sentence is a reasonable sentence, considering his background, in this case. Now, if I -- if it was incorrect that he received the proffer -- that he gave you this information before the proffer, you know, I think that would probably -- I would not have held that against him. But in this case the only evidence I have is that he gave you that information before the proffer.  So, with that, I find that to be a

reasonable sentence.

There's nothing else…

(*Id.* at 28).[10]

In announcing Lacey's sentence, the Court made repeated reference to the "guideline range" as "reasonable" and "appropriate," while making no mention of § 3553. In response to the Government's invitation after the sentence was announced, the Court repeated that the sentence was "reasonable," again without referencing § 3553 or making some statement affirmatively indicating that it would have imposed the same sentence regardless of any guidelines error. Upon consideration, the undersigned declines to accept the Government's position that any guideline error in Lacey's sentence is "harmless" under *Keene* and its progeny. *Compare Barner*, 572 F.3d at 1248 ("The U.S. Attorney argues that we need not reach Barner's challenge to the manner in which the Sentencing Guidelines were applied here, because any error was harmless. Specifically, he relies on the district court judge's statement that "having weighed and considered the imposition of a sentence in this case under both the [Sentencing Guidelines], as well as the factors outlined in 18 U.S.C. 3553, and the Court having concluded that a sentence under either would be about the same, the Court has decided to impose a sentence of 87 months pursuant to the guidelines because the custody guideline range for this case is fair and reasonable in light of the facts and circumstances surrounding the

---

[10] One interpretation of the answer "Yes" to the Government's invitation is that the Court was agreeing "this would be an appropriate sentence, regardless of the guideline calculations." However, one could also reasonably interpret the answer of "Yes" as the Court simply affirming that it would like to make an additional statement.

Defendant's role in this conspiracy."  Where a district judge clearly states that he would impose the same sentence, even if he erred in calculating the guidelines, then any error in the calculation is harmless.  The district judge here made no such statement. Instead, he indicated that the sentence was 'pursuant to the guidelines,' and the factors outlined in 18 U.S.C. § 3553. This statement does not provide the basis for a holding of harmless error. []Obviously, where the district judge chooses to sentence within the range prescribed by the Sentencing Guidelines, an error in their calculation cannot be harmless. Moreover, even where he chooses to impose a sentence based on the considerations prescribed in 18 U.S.C. § 3553, he must take into account the range prescribed by the Sentencing Guidelines. *See* 18 U.S.C. § 3553(a)(4) (2006). Consequently, the Guidelines range must be calculated correctly in the first instance." (internal citation omitted)), *with Keene*, 470 F.3d at 1348-49 ("After the court overruled Keene's objection and found what it believed to be the appropriate guideline range, taking into consideration the two-step enhancement, the court made clear that even if its interpretation and application of U.S.S.G. § 2B3.1(b)(2)(F) was wrong, it would still hand down the same 120-month sentence: 'And I will say for the record that even if the guideline calculations are wrong, my application of the sentencing factors under Section 3553(a) would still compel the conclusion that a 10-year sentence [120 months] is reasonable and appropriate under all the factors that I considered.' "), *and Ward v. United States*, Civil Action No. 12-00269-CG-N, 2014 WL 658004, at *4 (S.D. Ala. Feb. 19, 2014):

[excerpt from *Ward*]

At the sentencing hearing, the Assistant United States Attorney sought the following clarification from the Court:

> [AUSA] BEDWELL: ... But if I might, one additional point of clarification. And I perhaps just missed it. Did the Court find that the sentence was appropriate even if the guidelines were incorrectly calculated?

> THE COURT: Yes. I do find that the 151–month sentence is appropriate to meet the statutory purposes of sentencing ... [e]ven if that was not the guideline sentence.

(Doc. 80, sentencing hearing tr., at 51:24–52:8.) And, in denying Ward's direct appeal, the Eleventh Circuit—relying on this statement by the trial court—held that, because the sentence imposed was reasonable, "even if we were to assume that the court erred in its guideline calculations, the errors were harmless." Thus, because Ward's guideline calculation error was harmless, his counsel's failure to raise the issue; that is, object to how the Guidelines were calculated, even if deficient, could not have resulted in prejudice.

(footnote and some citations and quotations omitted).[11]

---

[11] *See also Deonarinesingh*, 542 F. App'x at 862:

> In cases on direct appeal, "[a]n error in the district court's calculation of the Sentencing Guidelines range warrants vacating the sentence, unless the error is harmless." *United States v. Barner*, 572 F.3d 1239, 1247 (11th Cir. 2009). The guideline error is harmless if the district court unambiguously expressed that it would have imposed the same sentence, even without the erroneous calculation. *Id.* at 1248. If the error is harmless, we need only inquire whether the sentence is reasonable. *See United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006). For example, in *United States v. Dean*, 517 F.3d 1224, 1232 (11th Cir. 2008), we noted that, "[a]t sentencing, the district court judge also stated that he still would have imposed [the same imprisonment term] as a reasonable sentence, regardless of any guidelines miscalculation, because of the facts of the case and defendant's misleading and shifting testimony offered in an effort to hide the truth." In Keene, the district court stated that "even if the guideline calculations are wrong, my application of the sentencing factors under Section 3553(a) would still compel the conclusion that a 10–year sentence ... is reasonable and appropriate under all the factors that I considered." 470 F.3d at 1349.

### 1.    Criminal History Category

First, Lacey claims that Darley was ineffective for failing to object to the inclusion of a prior offense in calculating his criminal history category.    In determining a defendant's criminal history category under the sentencing guidelines, the following directives apply:

> **(a)** Add 3 points for each prior sentence of imprisonment exceeding one year and one month.
>
> **(b)** Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a).
>
> **(c)** Add 1 point for each prior sentence not counted in (a) or (b), up to a total of 4 points for this subsection.
> …

---

In contrast, where the district court has emphasized that the guideline range influenced the sentence, we have held that a calculation error was not harmless. *See United States v. Paley*, 442 F.3d 1273, 1278–79 (11th Cir. 2006) (per curiam). In Paley, our conclusion regarding the harmlessness of the sentencing error was based largely on the district court's statement that it had been "a difficult sentencing" and that it had been "greatly influenced by the Advisory Guidelines." See id. We found that the erroneous calculation was not harmless in spite of the fact that the district court emphasized that a sentence of 18 months' imprisonment "adequately reflect [ed] the seriousness of the offense and provide[d] just and reasonable punishment." *Id.* at 1278.

Here, then, the district court's reliance on *Keene* on collateral review is misplaced. During sentencing, the district court repeatedly stated that it relied on the guidelines range and the government's "earlier announced position that they would not be recommending more than the low end of the guideline range." The district court mentioned the precise length of the sentence it would eventually impose only as an explanatory aside to its declaration "that the government ... recommends the low end." Although the court stated that "it ha[d] the authority to sentence anywhere within the range or without the range," such a statement does not negate the court's reliance on the guidelines. Even though the court noted its authority to disregard the guidelines in reaching a sentence, it also emphasized that the guidelines would be "highly suggestive of the appropriate and proper sentence that should be imposed." Under these circumstances, it is clear that the erroneous calculation "affect[ed] the district court's selection of the sentence imposed." *Paley*, 442 F.3d at 1278 (internal quotation marks omitted). The erroneous calculation here is therefore not harmless.

U.S.S.G. § 4A1.1.

Pursuant to § 4A1.1(c), Lacey's Presentence Investigation Report (PSI) added one point for Lacey's November 2001 conviction in an Alabama municipal court for carrying a pistol without a permit, which resulted in a sentence of a $100 fine and court costs. In objecting to this section of the PSI, attorney Williams stated:

> Pursuant to U.S.S.G. subsection 4A1.2(c) (1), certain offenses are only counted if the sentence was for a term of probation of at least one year, or a term of imprisonment of at least 30 days. Such offenses include "the following prior offenses and offenses similar to them, by whatever name they are known": Careless or reckless driving, Contempt of court, Disorderly conduct or disturbing the peace, Driving without a license or with a revoked or suspended license[.]
>
> As stated, Defendant only received a fine for the charge of no pistol permit, which is similar to the offense of driving while license revoked or suspended. For this reason the Defendant objects to the One (1) point enhancement recommended in the PSI.

(Doc. 22 at 3).

> The Sentencing Guidelines provide that "[s]entences for misdemeanor and petty offenses are counted" toward a defendant's criminal history score, subject to two exceptions in subsections 4A1.2(c)(1) and 4A1.2(c)(2). U.S.S.G. § 4A1.2(c). Under subsection (c)(1), certain enumerated offenses and "offenses similar to them" are to be disregarded unless "(A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." *Id.* § 4A1.2(c)(1)... Under subsection (c)(2), certain enumerated offenses and "offenses similar to them" are "never counted" toward a defendant's criminal history score...
>
> ..."Because the Guidelines' default rule for past offenses is one of inclusion, any doubts should be resolved in favor of counting the offense." *United States v. Hernandez*, 634 F.3d 317, 319 (5th Cir. 2011). "Moreover, the defendant has the burden of showing that the exception applies." *United States v. Martinez–Santos*, 184 F.3d 196, 200 (2d Cir. 1999); *see also United States v. Howard*, 923 F.2d 1500, 1505 (11th Cir.

1991) ("[T]he Guidelines have been interpreted to contemplate that the defendant bears the burden of establishing the applicability of Guideline sections which would reduce the offense level.").

An Application Note to the Sentencing Guidelines lists five factors that [a court] should consider, in a "common sense approach," to determine whether an unlisted offense is similar to one enumerated in subsection (c)(1) or subsection (c)(2):

> In determining whether an unlisted offense is similar to an offense listed in subsection (c)(1) or (c)(2), the court should use a common sense approach that includes consideration of relevant factors such as (i) a comparison of punishments imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

U.S.S.G. § 4A1.2 cmt. n.12(A). "Sentencing Guidelines commentary explaining or interpreting the Guidelines is 'authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.' " *United States v. Cortes–Salazar*, 682 F.3d 953, 954 (11th Cir. 2012) (quoting *Stinson v. United States*, 508 U.S. 36, 38, 113 S. Ct. 1913, 1915, 123 L.Ed.2d 598 (1993)). [Courts] apply these five factors mindful that, although the definitions of "disorderly conduct" and "public intoxication" within the meaning of the Sentencing Guidelines are matters of federal law, [they] look to state law definitions of these crimes for guidance. *See United States v. Palomino Garcia*, 606 F.3d 1317, 1327–28 (11th Cir.2010).

*United States v. Garcia-Sandobal*, 703 F.3d 1278, 1283-84 (11th Cir. 2013).[12]

---

[12]    The "prior offenses" specifically listed in § 4A1.2(c)(1) are Careless or reckless driving, Contempt of court, Disorderly conduct or disturbing the peace, Driving without a license or with a revoked or suspended license, False information to a police officer, Gambling, Hindering or failure to obey a police officer, Insufficient funds check,  Leaving the scene of an accident, Non-support, Prostitution, Resisting arrest, and Trespassing.

The "prior offenses" specifically listed in § 4A1.2(c)(2) are Fish and game violations, Hitchhiking, Juvenile status offenses and truancy, Local ordinance violations (except those violations that are also violations under state criminal law), Loitering, Minor traffic infractions (e.g., speeding), Public intoxication, and Vagrancy.

Lacey argues that his conviction for carrying a pistol without a permit was due to be excluded from his criminal history calculation under § 4A1.2(c)(1).[13]  (*See* Doc. 69 at 8).  However, no such offense is specifically listed in § 4A1.2(c)(1).  "An offense is excludable from one's criminal history if it is 'similar to' a list of offenses that are expressly excludable, among which [is] 'driving without a license or with a revoked or suspended license'..."  *United States v. Caputo*, 978 F.2d 972, 977 (7th Cir. 1992) (quoting U.S.S.G. § 4A1.2(c)(1)), and Williams argued that the offense of carrying a pistol without a permit is sufficiently "similar to the offense of driving while license revoked or suspended" to justify the application of § 4A1.2(c)(1) to that offense.  *See supra.*  However, neither Williams (then) nor Lacey (now) has cited any authority supporting this proposition (and the undersigned has found none), nor has Lacey made any attempt to apply the five-factor "common sense approach" to meet his burden to show that one of the exceptions under § 4A1.2(c) applies.  Because Lacey has made no attempt to demonstrate merit to his claim that one of the exceptions in § 4A1.2(c) applied to his conviction for carrying a pistol without a

---

[13] Had Lacey not received the additional criminal history point for this conviction (which would have left him with only 6 criminal history points), his criminal history category would have been III instead of IV.  With an offense level of 19, his guideline range would thus have been reduced from 46-57 years to 37-46 years.  *See* U.S.S.G. Ch. 5, Part A.  "While the reduced guideline range would not necessarily result in a lower sentence, *see United States v. Booker,* 543 U.S. 220, 245, 125 S. Ct. 738, 757, 160 L. Ed. 2d 621 (2005) (rendering the Sentencing Guidelines advisory),...the district court sentenced [Lacey] at the lowest end of the guideline range, which might indicate that the court would again choose the bottom end of any lower guideline range.  Therefore, [the undersigned] cannot say that the record conclusively demonstrates the absence of prejudice at sentencing."  *Sanz De La Rosa v. United States*, 481 F. App'x 480, 483 n.4 (11th Cir. 2012) (per curiam) (unpublished).

permit, he has not demonstrated that attorney Darley acted deficiently in failing to pursue this objection at sentencing.[14] [15]

## 2. "Manager or Supervisor" Enhancement

Second, Lacey claims that Darley was ineffective for not challenging an enhancement imposed under U.S.S.G. § 3B1.1(b), which "provide[s] for a three-level enhancement to the base offense level '[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive.' " *United States v. Baldwin*, No. 13-12973, 2014 WL 7173150, at *16 (11th Cir. Dec. 17, 2014) (published) (quoting U.S.S.G. § 3B1.1(b)).

> To apply the enhancement "the defendant must have been the organizer, leader, manager, or supervisor of one or more other

---

[14] In withdrawing the two objections Lacey advances on collateral review, Darley stated at the sentencing hearing: "Today, what we are challenging is only the first objection. The other two, based on my research, are appropriate in the situation. So we would like to focus on the first, and that is our understanding and that's what our position is today." (Doc. 64 at 3. *See also id.* at 14 ("[B]ased on my research and the point from the criminal conduct in North Port, we believe that, based on our reading, the law, and the guidelines, that's appropriate…")). The record, therefore, indicates that Darley looked into this objection before declining to pursue it and that this decision was a strategic one made for the purpose of concentrating on what Darley believed to be a stronger objection. Lacey has not shown that this decision was unreasonable.

[15] In one of his replies, Lacey claims that he "never had legal representation" on the carrying charge and that the "plea was done by a written letter from [prison] in or [sic] March 2006 just so [Lacey] could rid himself of this pending charge and detainer to participate in the drug program and halfway house." (Doc. 81 at 8). However, Lacey's claim that this was an uncounseled plea is contradicted by his PSI, which stated that he was represented by a public defender in that action. (*See* Doc. 23 at 12). Regardless, this objection is without merit, as "[p]rior sentences, not otherwise excluded, are to be counted in the criminal history score, **including uncounseled misdemeanor sentences where imprisonment was not imposed.**" U.S.S.G. § 4A1.2, cmt. (backg'd) (emphasis added). *See also United States v. Golden*, 669 F.3d 901, 903 (8th Cir. 2012) ("The district court…correctly scored one criminal history point under § 4A1.1(c) for a prior uncounseled misdemeanor that resulted in no jail time. *See* U.S.S.G. § 4A1.2, comment. (backg'd.).").

participants." U.S.S.G. § 3B1.1, cmt. n.2. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.,* cmt. n.l. Some factors the court may consider include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.,* cmt. n.4; *see United States v. Njau,* 386 F.3d 1039, 1041 (11th Cir. 2004) (noting that the district court could consider the factors in determining the nature of the defendants role).

*Id.*

"[W]hen a defendant challenges a factual basis of his sentence, 'the government has the burden of establishing the disputed fact by a preponderance of the evidence.' " *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004) (quoting *United States v. Liss,* 265 F.3d 1220, 1230 (11th Cir. 2001)). "The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." *Id.* (citing *United States v. Saunders*, 318 F.3d 1257, 1271 n.22 (11th Cir. 2003)).

Lacey claims that Darley was ineffective for failing to pursue an objection to this enhancement because Lacey "had no co-defendants[] or criminal participants[,]" because the "government could not single out one person whom participated with [Lacey] or was controlled by [him,]" and because the "agents were unable to locate and interview other individuals listed who it is believed [Lacey] aided in filing false

claims because of false addresses on the claims." (Doc. 69 at 8). Thus, Lacey claims, "[t]his case fell short of showing willing participants who knew criminal activities were being committed." (*Id.*).

Nothing in § 3B1.1 or its commentary indicates that participants must be specifically identified. Lacey admitted in the Factual Resume of his Plea Agreement that "he has created false documents for others in an attempt to aid them in getting money from the GCCF" (Doc. 17 at 5), and Lacey did not dispute the statement in his PSI that "[b]etween October 2010, and November 2010, [Lacey] filed approximately 60 fraudulent claims against BP on behalf of other; 16 of which were known to law enforcement prior to the defendant's proffer of information." (Doc. 23 at 7, ¶ 25).

Moreover, at sentencing, the Government called as a witness Joseph Paul, a Secret Service agent involved in investigating Lacey's fraudulent GCCF claims. Agent Paul testified that Lacey assisted eight others in filing fraudulent claims with the GCCF in exchange for receiving a percentage of the claim.[16] (*See* Doc. 64 at 4-10). Contrary to Lacey's assertion, Agent Paul identified these eight individuals by their last names, and he noted that all of the fraudulent claims "had in common the same IP address, which indicated they were all filed from the same computer, or they all shared the same business name or business address on the

---

[16] Agent Joe Lea was the primary case agent for Lacey's case. At the time of the sentencing hearing, he was on vacation. Agent Paul, a "colleague" of Agent Lea, at the request of the Government and Lea, "reviewed the file and spoke with him about this investigation" in order to testify at the hearing. (Doc. 64 at 4-5). Agent Paul affirmed that he felt "comfortable and competent to testify about what the loss amount is as it relates to what documents you've reviewed and in speaking with the case agent[.]" (*Id.* at 5).

supporting documentation submitted." (*Id.* at 6). Agent Paul also agreed that "Lacey himself confessed to being involved in those fraudulent claims…" (*Id.*).

Lacey has identified no evidence that could have been used to rebut these admissions and testimony, which were sufficient to justify application of § 3B1.1(b). *Cf. Baldwin*, 2014 WL 7173150, at *16 ("Belizaire's factual proffer accompanying his guilty plea indicates that he acted as a manager. Belizaire received names and social security numbers from co-conspirators for the purpose of submitting fraudulent returns. Belizaire also recruited other unindicted co-conspirators to obtain addresses of residences where the debit cards could be received. Further, Belizaire was deeply involved in the conspiracy. He sent and received victims' personal identification information used to file the fraudulent tax returns as well as debit card account numbers that were to be used for receiving the victims' tax refunds. Many of the fraudulent tax returns were also submitted from an IP address registered in Belizaire's name. Finally, Belizaire made numerous withdrawals of the distributed returns with the debit cards. Taking the factors prescribed by the statute into account, the district court did not clearly err in finding that Belizaire was a manager or supervisor of one or more participants."). Lacey's allegations do not show that Darley acted deficiently in failing to pursue an objection to that enhancement.

### 3.     Use of Proffer Information

Regarding his claim that Darley allowed the Government to enhance his sentence using information provided as part of Lacey's cooperation agreement, Lacey, throughout his various filings, has alleged as follows:

42

- "Petitioner would like to have a [sic] evidentiary hearing on the breach of his proffer…All persons mentioned at sentencing by the Government were given to agents by petitioner and were not on the list from petitioner's trunk. Agents have not interviewed nor located any person mentioned at sentencing." (Doc. 71 at 7).

- "[P]etitioner states again that his proffer was used against him…Agent Paul swore under oath that he was sure the government know about this before the proffer…This agent blatantly committed perjury in open court.  The agent nor the government knew any dates and counsel failed to object…Records show no interview with any individuals regarding the relevant conduct.  The only information they have linking petitioner to any claimant was either seized illegally from his trunk or obtained after the proffer." (Doc. 81 at 7).

- "[C]ounsel allowed the government to use information from his 4/19/2012 proffer meeting at this sentencing…Counsel[] was ineffective for not having a copy of the proffer at sentencing.  The Government failed to produce one as well.   The case agent Joseph Lea was on vacation, nor were any witnesses present, no case file, no affidavits from the eight people used to enhance petitioner's sentence, no dates when or if agents spoke with these claimants, nor a date to establish if the information came after or before the proffer… Counsel[] declined to point out to the court that the government fell extremely short of proving a preponderance of evidence…to prove relevant

conduct.  Counsel failed to request the sentencing be post-poned so that the sentencing factors be resolved…Counsel in this case failed to raise the issue of holding an evidentiary hearing to determine if the government was using information against this petitioner that was given after his proffer.  During sentencing the AUSA admitted that she thought the proffer agreement might be an issue before sentencing but refuse [sic] to present or bring the proffer to sentencing to resolve the dispute." (Doc. 82 at 15-17).

U.S.S.G. § "1B1.8 provides that, '[w]here a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and ... the government agrees that self-incriminating information ... will not be used against the defendant, then such information shall not be used in determining the applicable guideline range.' " *United States v. Pham*, 463 F.3d 1239, 1243 (11th Cir. 2006) (per curiam) (quoting U.S.S.G. § 1B1.8(a)).  "However, some information is also excepted from the rule, such as information known to the government prior to entering the agreement…" *Id.* (citing U.S.S.G. § 1B1.8(b)(1)). Additionally, "so long as the information is obtained from independent sources or separately gleaned from codefendants, it may be used at sentencing without violating § 1B1.8." *Id.* at 1244.  "[W]here a defendant alleges a violation of U.S.S.G. § 1B1.8 in district court, the court is required to make factual findings that are reviewed for clear error." *Id.*

Paragraph 25 of Lacey's PSI stated: "Between October 2010, and November 2010, the defendant filed approximately 60 fraudulent claims against BP on behalf

of others; 16 of which were known to law enforcement prior to the defendant's proffer of information.  Of the sixteen claims known to law enforcement, prior to the defendant's proffer, there was a known intended loss of at least $178,967.00, which included an actual loss of at least $93,200.00."  (Doc. 23 at 7).  Though Williams noted this factual assertion in the sentencing objections he filed on Lacey's behalf (*see* Doc. 22 at 1), he did not object to its veracity.  Lacey himself (rather than Darley) brought this issue to the Court's attention at the sentencing hearing, stating: "A lot of those names were names I gave them at my proffer agreement with -- I didn't know they was supposed to use it against me." (Doc. 64 at 20).  The Court asked the Government to "respond to the part that you used information after the proffer[,]" to which the Assistant United States Attorney stated: "It's my understanding, Your Honor, that the information as it relates to anything that we have used here today came before the proffer."  (*Id.* at 22).

The Court then asked the Government: "Well, do you want to put on any evidence about that, just to make the record clear, so that we don't have to address this again in another proceeding?"  (*Id.*).  In response, the Government recalled Agent Paul.  On direct examination by the Government, Agent Paul testified: "In speaking with Agent Lea, the case agent, it's my understanding all these names were provided prior to the proffer." (*Id.* at 23).  The Court then asked the agent: "So do you have a timeline of when [Lacey] was arrested and he talked to y'all and then there was an agreement and then he talked to y'all two more times or something like that?" (*Id.* at 23-24).  Agent Paul responded: "I don't have Agent Lea's case file

with me to have the dates of all this."    (*Id.* at 24).    At this point, the Assistant

United States Attorney interjected:

> But, Your Honor, I would proffer to the court that specifically we
> thought it might -- that this one might be an issue as it relates to these
> names. So I asked Joe point blank when this information came to our
> attention, and he told me that these names we learned before any
> proffer agreement. And I think he reiterated that to Mr. Paul who
> stated it to the court.

(*Id.*).    Agent Paul affirmed this proffer, stating: "That's correct."  (*Id.*).

> On cross-examination, Darley questioned the agent as follows:

> Q. Agent Paul, do you have the dates that Mr. Lacey supposedly
> provided this information pre-proffer to Agent Lea?

> A. No, I do not.

> Q. Do not. No written documents or anything of that sort?

> A. No. I don't have anything with me that details that.

> Q. All right. So you don't know the day he was interviewed?

> A. I do not.

> Q. Do you know the day he signed the proffer?

> A. I do not.

> Q. Do you know the day he was arrested?

> A. No.

> MR. DARLEY: Nothing further, Judge.

(*Id.* at 24-25).

> After hearing this and announcing Lacey's sentence, the Court stated: "Now,

if I -- if it was incorrect that he received the proffer -- that he gave you this

information before the proffer, you know, I think that would probably -- I would not

have held that against him.  But in this case the only evidence I have is that he

gave you that information before the proffer."  (*Id.* at 28).

     The Eleventh Circuit has clearly held that

> absent a stipulation or agreement between the parties, an attorney's
> factual assertions at a sentencing hearing do not constitute evidence
> that a district court can rely on. *See, e.g.*, *United States v. Onofre–
> Segarra*, 126 F.3d 1308, 1310–11 (11th Cir. 1997) ("The arguments of
> counsel and the challenged conclusions of the presentence
> investigation report ... are generally an insufficient basis upon which
> to depart from the guidelines."); *United States v. Wilson*, 884 F.2d
> 1355, 1356 (11th Cir. 1989) ("At the sentencing hearing defendant's
> counsel argued that defendant's plea negotiations demonstrated
> acceptance of responsibility but offered no evidence that would
> establish his qualification for a reduction under this section.... Because
> at sentencing defendant offered no evidence of acceptance of
> responsibility and the evidence at trial did not clearly demonstrate
> such an acceptance, defendant simply failed to meet his burden of
> proof[.]").

*United States v. Washington*, 714 F.3d 1358, 1361-62 (11th Cir. 2013).  *Accord*

*United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013) ("Absent a

stipulation or agreement between the parties, however, an attorney's factual

assertions alone do not constitute evidence that a District Court can rely on[ at

sentencing]."  (citing *Washington*, 714 F.3d at 1361)).  As such, the assurances by

counsel for the Government that the challenged information was known pre-proffer

did not constitute evidence that could be considered in determining whether a

violation of  § 1B1.8 had occurred.  The Court acknowledged as much when it

invited the Government to put on "evidence about that…"  (Doc. 64 at 22).

Agent Paul's testimony that the challenged information was known pre-proffer was based entirely on out-of-court assurances made by Agent Lea and thus constituted hearsay. While " 'the law of this Circuit clearly provides that reliable hearsay can be considered during sentencing[,]' " *Rodriguez*, 732 F.3d at 1305 (quoting *United States v. Zlatogur*, 271 F.3d 1025, 1031 (11th Cir. 2001)) (alteration added), a "district court may[ only] rely on such evidence 'as long as the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence.' " *Zlatogur*, 271 F.3d at 1031 (quoting *United States v. Anderton*, 136 F.3d 747, 751 (11th Cir. 1998) (per curiam))). However, "[w]hile it may be advisable and in some instances necessary for a district court to make distinct findings regarding the reliability of hearsay statements used at sentencing, the absence of such findings does not necessarily require reversal or remand where the reliability of the statements is apparent from the record." *United States v. Gordon*, 231 F.3d 750, 761 (11th Cir. 2000). *Accord United States v. Docampo*, 573 F.3d 1091, 1098 (11th Cir. 2009) ("The district court did not make explicit findings about the reliability of Agent Gistinger's hearsay testimony, but that failure 'does not necessarily require reversal or remand where the reliability of the statements is apparent from the record.' " (quoting *Gordon*, 231 F.3d at 761)); *United States v. Harper*, 339 F. App'x 974, 976 (11th Cir. 2009) (unpublished) (per curiam) ("In *United States v. Gordon,* 231 F.3d 750 (11th Cir. 2000), we held that where there was materially consistent evidence from other

48

sources, to be considered along with the hearsay, such evidence could establish reliability.").

While Lacey has made some conclusory allegations that he believes Agent Paul was not telling the truth on the stand, a close reading of Lacey's allegations regarding this issue, particularly his repeated emphasis that the Government provided "no dates" and had not shown they had interviewed any of the named individuals, indicates that Lacey is in fact simply arguing that Agent Paul's testimony was insufficient to meet the Government's burden of proof by a preponderance of the evidence.  Lacey, however, has cited no authority indicating that such specificity is required for the Government to meet its burden.

Moreover, Agent Paul had already admitted that he was not the lead case agent and that his testimony was based largely on review of Lacey's case file and consultation with the lead agent (*see* Doc. 64 at 4-5), and such testimony was accepted by the Court, without objection from Lacey, to prove other sentencing factors.  Thus, the reliability of Agent Paul's hearsay testimony is apparent from the record.  Additionally, despite the fact that Lacey himself had brought the proffer issue to the Court's attention, Lacey made no effort to testify or speak out in disagreement with Agent Paul's testimony on the issue, nor has he alleged instructing Darley to do so.

Finally, Agent Paul's testimony indicates that the eight individuals' fraudulent claims could have been traced to Lacey from independent sources – namely, from the fact that they "had in common the same IP address, which

indicated they were all filed from the same computer, or they all shared the same business name or business address on the supporting documentation submitted." (Doc. 64 at 6).

In sum, Lacey's allegations in support of his challenge regarding the alleged use of proffer information have failed to demonstrate that he is entitled to relief under *Strickland*.   Accordingly, the undersigned **RECOMMENDS** that Lacey's claims of ineffective assistance of counsel at sentencing be **DENIED**.

### D.    Discovery Motions

Lacey has moved "to subpoena his emails from Baldwin County Correctional Facility Inmate Emails which was in reference to petitioner inquiring to other attorneys Jim Byrd and Sid Harrell[17] about if police can search your vehicle if your license is suspended.   The reason was because Counsel Blackmon always told [Lacey] that police could search your vehicle if your license was suspended."   (Doc. 82 at 22).   Lacey has also made multiple motions (Docs. 83, 86) that the Government be compelled to produce the RADD complaint mentioned in his factual resume as initiating the investigation into Lacey's fraudulent GCCF claims.   (*See* Doc. 17 at 2 ("This case originated April 2011, when SA Sean Connor contacted the Mobile Resident Office of the United States Secret Service.   SA Connor is a Secret Service Special Agent assigned to the National Center for Disaster Fraud in Baton Rouge, LA…SA Connor provided a RADD Complaint report that indicated a complaint was called into the fraud hotline.   This complaint was made against

---

[17] Harrell served as appointed counsel for Lacey in another criminal action in this district, 1:13-cr-112-KD-C.

Adrian Lacey, indicating that he is filing claims for people in exchange for keeping part of the assistance provided by the Gulf Coast Claims Facility (GCCF) Fund.").

Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts provides, in relevant part:

> (a) **Leave of Court Required**. A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law…

> (b) **Requesting Discovery**. A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents.

"A habeas proceeding is not a fishing expedition…The Supreme Court has defined 'good cause' in th[e] context[ of collateral review] as specific allegations that give a court 'reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief.' " *Teti v. Bender*, 507 F.3d 50, 60 (1st Cir. 2007) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997). As explained above, the validity of the August 30, 2011 traffic stop and search need not be examined in order to deny Lacey relief. Thus, Lacey has not shown "good cause" to compel discovery regarding the emails.

Lacey's request for the RADD complaint appears premised on his belief that there is in fact no such complaint and that, contrary to the assertion in the Factual Resume that the federal criminal investigation against him "originated in April 2011" based on this complaint, the investigation actually originated from the evidence seized during the August 30, 2011 traffic stop and search. Because, Lacey

figures, all evidence against him taken from that point on was due to be suppressed, and because the RADD complaint doesn't exist, the Government would be left with no admissible evidence to support a conviction. (*See* Doc. 83 at 1-2 ("Absent this complaint, petitioner boldly asserts that his case started from the August 2011 beyond a reasonable doubt…[I]f the government cannot produce this alleged complaint petitioner ask this court grant the relief sought by petitioner which is a vacation of his guilty plea and then case being dismissed due to the exclusionary rule being applicable.")).    Construing this request broadly, Lacey apparently believes he must make this request in order to further show that he was prejudiced by Williams's failure to file a suppression motion.

As explained above, the undersigned has determined that Lacey has not alleged facts satisfying *Strickland*'s "deficient performance" prong regarding Williams's failure to file a motion to suppress; thus, the undersigned need not address *Strickland*'s "prejudice" prong regarding this claim.    Therefore, even if the Court were to order production of the RADD complaint, the complaint's production, or lack thereof, would still not entitle Lacey to relief on his claim.

Accordingly, the undersigned **RECOMMENDS** that Lacey's various requests for discovery (Doc. 82 at 22; Doc. 83; Doc. 86) be **DENIED**.

E.    **"Motion Requesting an Urgent Evidentiary Hearing/Motion to Amend Pending 18 USC § 2255" (Doc. 84)**

In his "Motion Requesting an Urgent Evidentiary Hearing/Motion to Amend Pending 18 USC § 2255" (Doc. 84), Lacey seeks to add a claim that the Court enhanced his sentence under the guidelines in violation of *United States v. Booker*,

543 U.S. 220 (2005). "*Booker* holds that 'the Sixth Amendment right to trial by jury is violated where *under a mandatory guidelines system* a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury.' " *United States v. Smith*, 480 F.3d 1277, 1281 (11th Cir. 2007) (quoting *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir.) (emphasis in original), *cert. denied*, 545 U.S. 1127 (2005)).

First, because all errors Lacey claims in this motion could have, but were not, raised on direct appeal (or, at least, did not give the Eleventh Circuit the opportunity to decide it), he has procedurally defaulted his claims under *Booker* and thus may not raise them on collateral review. Second, the record conclusively indicates that the Court treated the guidelines system as advisory, not mandatory[18] – accordingly, *Booker* is not implicated here. "A misapplication of advisory sentencing guidelines does not violate an ancient right, nor does it raise constitutional concerns." *Spencer v. United States*, No. 10-10676, 2014 WL 6234529, at *6 (11th Cir. Nov. 14, 2014) (en banc) (published). "When a prisoner…alleges that his 'sentence was imposed in violation of the ... laws of the United States ... or is otherwise subject to collateral attack,' 28 U.S.C. § 2255(a), a district court lacks the authority to review the alleged error unless the claimed error constitutes a fundamental defect which inherently results in a complete miscarriage of justice… When…a federal prisoner, sentenced below the statutory maximum, complains of a

---

[18] (*See, e.g.*, Sentencing Trans., Doc. 64 at 27 ("I find a [sic] the advisory guideline range is appropriate for the facts and circumstances of this case and provides a reasonable sentence.")).

sentencing error and does not prove either actual innocence of his crime[19] or the vacatur of a prior conviction, the prisoner cannot satisfy the demanding standard that a sentencing error resulted in a complete miscarriage of justice." *Id.* at *4-5 (some quotations omitted). Lacey has not shown a "complete miscarriage of justice" in any of the claimed guidelines sentencing errors. Thus, the undersigned **RECOMMENDS** that Lacey's "Motion Requesting an Urgent Evidentiary Hearing/Motion to Amend Pending 18 USC § 2255" (Doc. 84) be **DENIED**.

For these same reasons, the undersigned also **RECOMMENDS** that the Court also **DENY** Lacey's claim in his § 2255 motion that the Court's imposition of a 12-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G) was error because "the factual resume and presentence report are to vagued [sic] to support nearly a two hundred thousand dollar upward departure[,]" because he only "pled guilty to fifty thousand dollars" (Doc. 71 at 7).

### F.   Motion to Appeal Criminal Forfeiture (Doc. 85)

Lacey has also filed a "Motion to Appeal Criminal Forfeiture under FRCP 32.2" (Doc. 85), seeking return of the $32,000 seized from him by law enforcement officials during his September 9, 2010 drug arrest (*see* Doc. 17 at 2 ("Lacey was also

---

[19] Lacey has only argued *legal* innocence of his crime because he believes evidence was due to be suppressed. *Legal* innocence is not the same as *actual innocence*. *See McKay v. United States*, 657 F.3d 1190, 1199 (11th Cir. 2011) ("McKay makes the purely *legal* argument that he is actually innocent of his career offender sentence because his prior conviction for carrying a concealed weapon should not have been classified as a 'crime of violence' under the Guidelines. McKay does not even suggest, because he cannot, that he did not actually commit the crime of carrying a concealed weapon. In other words, he makes no claim of *factual* innocence of the predicate offense. No circuit court has held that the actual innocence exception is available for claims of purely legal innocence, like McKay's, and we refuse to do so as well.").

arrested on September 9, 2011 for possession of narcotics. He also had $32,000 cash in his possession at the time of arrest.")[20] and the $18,000 he was ordered to pay as restitution (*see* Doc. 43).

No forfeiture proceedings under Federal Rule of Criminal Procedure 32.2 were ever instituted in this action. The $18,000 in restitution was imposed as part of the criminal judgment against Lacey. (*See* Doc. 43). Because Lacey agreed to the dismissal of his direct appeal with prejudice (*see* Doc. 76), he has forfeited his opportunity to appeal that portion of his sentence.[21]

Regarding the $32,000 seized during the traffic stop, the undersigned treats this as a motion to return property under Federal Rule of Criminal Procedure 41(g).

> A motion to return seized property under Fed. R. Crim. P. 41(g), is a motion in equity, in which courts will determine all the equitable considerations in order to make a fair and just decision. When an owner invokes Rule 41(g) after the close of all criminal proceedings, the court treats the motion for return of property as a civil action in equity. *See United States v. Potes Ramirez,* 260 F.3d 1310, 1314 (11th Cir. 2001); *see also United States v. Martinez,* 241 F.3d 1329, 1330–31 (11th Cir. 2001) (holding that a district court has equitable jurisdiction over a Rule 41(e) motion brought after all criminal proceedings against a defendant have ended.)

---

[20] In an apparent error, the last sentence of the Factual Resume states: "August 30, 2011, approximately $32,000.00 of the $50,000.00 was seized from Lacey." Lacey's PSI, however, also puts the date the $32,000 was seized as being September 9, 2011. (*See* Doc. 23 at 5, ¶ 15; 16, ¶ 58).

[21] This would also be true if any of the requested funds had been subject to criminal forfeiture. *See United States v. Prat,* 584 F. App'x 921, 924 (11th Cir. 2014) (per curiam) (unpublished) (" '[C]riminal forfeiture is part of a defendant's sentence.' *United States v. Gilbert,* 244 F.3d 888, 924 (11th Cir.2001). With respect to the defendant (as opposed to third-party claimants), the district court's preliminary forfeiture orders become final at his sentencing. *See* Fed. R. Crim. P. 32.2(b)(4)(A); *United States v. Petrie,* 302 F.3d 1280, 1284 (11th Cir. 2002) ("At sentencing, the order of forfeiture becomes final as to the defendant and is made a part of the sentence and included in the judgment." (quotation marks omitted)). [] A defendant's time to file an appeal from a criminal forfeiture order begins to run when the judgment is entered. Fed. R. Crim. P. 32.2(b)(4)(C).").

Rule 41(g) provides:

> "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings."

Fed. R. Crim. P. 41(g) (2005).

In order for an owner of property to invoke Rule 41(g), he must show that he had a possessory interest in the property seized by the government…

Furthermore, in order for a district court to grant a Rule 41(g) motion, the owner of the property must have clean hands. *See Gaudiosi v. Mellon,* 269 F.2d 873, 881–82 (3d Cir. 1959) (stating, no principle is better settled than the maxim that he who comes into equity must come with "clean hands" and keep them clean throughout the course of the litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim.)

*United States v. Howell*, 425 F.3d 971, 974 (11th Cir. 2005).

Here, Lacey pled guilty to Count Two of the indictment, which expressly charged him filing a false GCCF claim in the amount of $50,000. (Doc. 1 at 3). Lacey also admitted to this $50,000 false claim in his Factual Resume and further admitted that "the money that was in his possession at the time of his arrest on September 9, 2010 was directly from the sale of his vehicle that he purchased with the Fraudulent BP money." (Doc. 17 at 2-3, 5). Because Lacey admitted that the $32,000 was obtained from his criminal activity, he has not demonstrated "clean hands" entitling him to relief under Rule 41(g). *Cf. Howell*, 425 F.3d at 974 ("The

doctrine of 'unclean hands' is an equitable test that is used by courts in deciding equitable fate. The defendant in the instant case has come into court with extremely 'unclean hands.' One engaged in this type of criminal conduct is hardly entitled to equitable relief."); *United States v. Zambrano*, 353 F. App'x 227, 229 (11th Cir. 2009) (per curiam) (unpublished) ("Here,…Zambrano pled guilty to a drug offense in which he used the disputed currency and, as part of his guilty plea, he expressly agreed to forfeit the funds…Given Zambrano's conduct, there are precious few equities we can discern that cut in Zambrano's favor, and indeed, so many equities that cut so heavily against him. As a result, we see no basis on which the district court could have relied to exercise its discretion to review Zambrano's Rule 41(g) motion under its equitable authority.").

Accordingly, the undersigned **RECOMMENDS** that Lacey's "Motion to Appeal Criminal Forfeiture under FRCP 32.2" (Doc. 85) be **DENIED**.

## G. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned **RECOMMENDS** that a Certificate of Appealability be **DENIED** for Lacey's § 2255 motion. 18 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate of appealability may only issue where "the applicant has made a

substantial showing of the denial of a constitutional right." 28 U.S.C. § 2243(c)(2).

Where, as here, the district court "has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). *See also Miller-El*, 537 U.S. at 336 ("Under the controlling standard, a petitioner must show that reasonable jurists could debate whether  (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." (citations omitted and punctuation modified)).).   "A prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part." *Miller-El*, 537 U.S. at 338 (quotations omitted).   The undersigned finds that reasonable jurists could not debate whether Lacey's § 2255 motion to vacate should be resolved in a different manner or that any of the remaining issues presented is adequate to deserve encouragement to proceed further.   Accordingly, Lacey is not entitled to a Certificate of Appealability as to these claims.

Rule 11(a) further provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  If there is an objection to this recommendation by petitioner, he may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation. *See, e.g., Brightwell v. Patterson*, No. CA 11-0165-WS-

C, 2011 WL 1930676, at *6 (S.D. Ala. Apr. 11, 2011), *report & recommendation adopted*, 2011 WL 1930662 (S.D. Ala. May 19, 2011)[22]; *Griffin v. DeRosa*, No. 3:10cv342/RV/MD, 2010 WL 3943702, at *4 (N.D. Fla. Sep. 20, 2010) (providing for same procedure), *report & recommendation adopted sub nom. Griffin v. Butterworth*, 2010 W: 3943699 (N.D. Oct. 5, 2010).

## H.   Appeal *In Forma Pauperis*

"An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith." 28 U.S.C.A. § 1915(a)(3).  A district court's finding "that an appeal would not be in good faith because no certificate of appealability had been issued . . . is not enough to explain why the appeal on the merits would not be in good faith, because the standard governing the issuance of a certificate of appealability is not the same as the standard for determining whether an appeal is in good faith. It is more demanding . . . [T]o determine that an appeal is in good faith, a court need only find that a reasonable person could suppose that the appeal has some merit." *Walker v. O'Brien*, 216 F.3d 626, 631-32 (7th Cir. 2000). *See also Weaver v. Patterson*, Civ. A. No. 11-00152-WS-N, 2012 WL 2568218, at *7 (S.D. Ala. June 19, 2012) (Nelson, M.J.), *report and recommendation adopted*, Civ. A. No. 11-00152-WS-N, 2012 WL 2568093 (S.D. Ala. July 3, 2012) (Steele, C.J.) ("An appeal may not be taken *in forma pauperis* if the trial court certifies in writing that the appeal is not taken in good faith. 28 U.S.C. § 1915(a)(3); *see* Fed. R. App. P.

---

[22] It should be noted that in that proceeding, the Eleventh Circuit (Judge Hull) also denied the petitioner's motion for certificate of appealability on October 11, 2011.  (*See* Doc. 14 in CA-11-0165-WS-C.)

24(a)(3)(A); *Lee v. Clinton*, 209 F.3d 1025, 1026 (7th Cir. 2000) (concluding that 'good faith' is 'an objective concept' and that 'not taken in good faith' is 'a synonym for frivolous'); *DeSantis v. United Techs, Corp.*, 15 F. Supp. 2d 1285, 1288–89 (M.D. Fla. 1998) (stating that good faith 'must be judged by an objective, not a subjective, standard' and that an appellant 'demonstrates good faith when he seeks appellate review of any issue that is not frivolous'). An appeal filed *in forma pauperis* is frivolous if 'it appears that the Plaintiff has little to no chance of success,' meaning that the 'factual allegations are clearly baseless or that the legal theories are indisputably meritless.' *Carroll v. Gross*, 984 F.2d 392, 393 (11th Cir. 1993)."). *But see, e.g., United States v. McCray*, No. 4:07CR20-RH, 2012 WL 1155471, at *2 (N.D. Fla. Apr. 5, 2012) ("Because the defendant has not obtained—and is not entitled to—a certificate of appealability, any appeal by the defendant will not be taken in good faith. I certify under Federal Rule of Appellate Procedure 24(a) that any appeal will not be taken in good faith and that the defendant is not otherwise entitled to proceed *in forma pauperis* on appeal.").

In light of the above-stated reasoning, the undersigned **RECOMMENDS** the Court certify that any appeal by Lacey in this action would be without merit and therefore not taken in good faith and, accordingly, find that Lacey is not entitled to appeal *in forma pauperis*.

## IV.   Conclusion

In accordance with the above-stated reasoning, the undersigned **RECOMMENDS** that Lacey's two motions to compel discovery (Docs. 83, 86), his

"Motion Requesting an Urgent Evidentiary Hearing/Motion to Amend Pending 18 USC § 2255" (Doc. 84), and his "Motion to Appeal Criminal Forfeiture under FRCP 32.2" (Doc. 85) all be **DENIED**.  The undersigned further **RECOMMENDS** that Lacey's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (Docs. 69, 71), as supplemented (*see* Docs. 81, 82, 87), be **DENIED**, that this action be **DISMISSED with prejudice**, that judgment be entered in favor of the Respondent, and that Lacey be found <u>not</u> entitled either to a Certificate of Appealability or to appeal *in forma pauperis*.

## V.     Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. L.R. 72.4.  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 11th day of February 2015.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**